# United States Tax Court

167 T.C. No. 8

SIH PARTNERS LLLP, EXPLORER PARTNER CORP., TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

―――――――

Docket No. 10099-20.                    Filed August 6, 2026.

―――――――

The TMP of partnership S timely petitioned this Court challenging R's adjustments in a Notice of Final Partnership Administrative Adjustment regarding qualified dividend income (QDI), reclassified as ordinary dividend income, and corresponding foreign tax credits (FTC). R principally contends that investment positions held by S are substantially similar or related property as defined by I.R.C. § 246(c)(4) and accompanying Treasury regulations.

*Held*: The Substantial Overlap Test in Treas. Reg. § 1.246-5(c)(1)(iii) has not been met; however, the Anti-Abuse Rule of Treas. Reg. § 1.246-5(c)(1)(vi) is applicable, and therefore S is not entitled to QDI treatment under I.R.C. §§ 1(h)(11)(B)(iii)(I) and 246(c).

*Held, further*, S has not satisfied all statutory requirements to qualify for the FTC.

―――――――

**Served 08/06/26**

*Nathan P. Wacker*, *Rajiv Madan*, *Nathaniel J. Dorfman*, *Christopher P. Bowers*, *Erin E. Girbach*, and *Nadiya F. Beckwith-Stanley*, for petitioner.

*Brandon S. Cline*, *Christopher A. Pavilonis*, *Thomas J. Kerrigan*, *Naseem Jehan Khan*, and *Michael E. Washburn*, for respondent.

WEILER, *Judge*: On December 5, 2019, the Internal Revenue Service (IRS) issued a Notice of Final Partnership Administrative Adjustment (FPAA) for the tax year ending December 31, 2012 (tax year at issue), to Explorer Partner Corp., the tax matters partner for SIH Partners, LLLP (SIHP). In the FPAA respondent (i) reduced SIHP's qualified dividend income (QDI) by $170,764,863; (ii) reclassified the reported QDI of $170,764,863 as ordinary dividend income; and (iii) reduced SIHP's foreign tax credit by $25,614,729 on the basis of section 246(c)(4)[1] and accompanying Treasury regulations.

The two issues for decision are whether (1) SIHP's $170,764,863 of QDI should be reclassified as ordinary dividend income and (2) SIHP's foreign tax credit should be reduced by $25,614,729.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. The Stipulation of Facts and the attached Exhibits are incorporated herein by this reference.

I. *SIHP*

SIHP, the partnership at issue in the case, is a limited liability partnership organized under the laws of the State of Delaware on April 2, 2007, and classified as a partnership under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA),[2] Pub. L. No. 97-248, §§ 401–407, 96

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] Before its repeal TEFRA governed the tax treatment and audit proceedings for many partnerships, including SIHP.

Stat. 324, 648–71. SIHP had its principal place of business in Delaware when the Petition was timely filed.

SIHP wholly owns Susquehanna International Holdings, LLC (SIH), a limited liability company organized under the laws of the State of Delaware. SIH in turn owns CVI Holdings LLC (CVIH), also a limited liability company organized under the laws of the State of Delaware. CVIH wholly owns Capital Ventures International (CVI), an unlimited liability company with share capital organized under the laws of the Cayman Islands. For U.S. federal income tax purposes, SIH, CVIH, and CVI were disregarded entities of SIHP with all items of income, gain, loss, deduction, and credit reported by SIHP.

During the tax year at issue SIHP had six partners: petitioner, Colombus International Holdings, Inc., Cortes International Holdings, Inc., Coronado International Holdings, Inc., Lasalle International Holdings, Inc., and Balboa International Holdings, Inc. Petitioner's shareholders during the tax year at issue were Jeffrey Yass, Arthur Dantchik, Eric Brooks, and Joel Greenberg.

## II.  *SIG*

SIHP, SIH, CVIH, and CVI are affiliated with Susquehanna International Group, LLP (SIG). SIG is a privately held global trading firm, founded in 1987, and it is an active participant in the options and futures market in over 50 stock and options exchanges. SIG's core business is to act as a liquidity provider in financial markets, such as the NYSE and NASDAQ, as a "market maker" where it provides two-sided markets—a bid price and an offer price—on a continuous basis to ensure a fair, efficient, and liquid market.

SIG engages in millions of trades around the world each business day. SIG trades and makes proprietary investments in equities, fixed income, energy, commodity, index, derivative products, private equity, and venture capital, research, customer trading, and institutional sales. SIG has a work force of approximately 3,300 employees who are employed through entities under its management that are registered as broker-dealers with the U.S. Securities and Exchange Commission. Like other market makers, when SIG buys or sells a particular option it typically also acquires an offsetting position to hedge[3] any risk. This

---

[3] Typically, a "hedge" is two investments that offset the specific risks of each other. For example, long and short positions of similar value in S&P 500 index (SPX) and SPY, respectively, would be a typical hedge.

hedging allows SIG to be financially indifferent as to whether the values of the options being traded increase or decrease in price. Because market makers like SIG are hedged in this way, they do not earn a profit through hedge trading. Rather, SIG makes a return from its bid-ask spread, which is the fractional difference (often pennies or less) between their offered bid price and their offered ask price.[4] This small margin, however, correlates to the minimal risk involved, a key factor for SIG's interest as market makers avoid taking on potential risks with respect to the positions they choose to trade in.

SIG maintains longstanding, unhedged short positions[5] in one or more indexes or securities to mitigate risk in the event of an economic downturn (Firm Hedge). The Firm Hedge has existed in some form and amount continuously since 1987 and has lost approximately $1.25 to $2.5 billion. In 2012 the Firm Hedge[6] consisted of three indexes: an index fund and two exchange-traded funds (ETFs)[7] which included the SPX, the IWM, and the FXI.[8]

SIG often transferred ownership of the Firm Hedge among its affiliates. Ultimately, the location of the Firm Hedge, i.e., which entity holds the rights at what time, is irrelevant as the overall financial impact remains the same because of the structure of the firm. Moreover,

---

[4] A "bid price" is the highest price that a buyer is willing to pay for an option, while an "ask price" is the lowest price that a seller is willing to accept.

[5] Maintaining a short position in stocks is essentially the practice of selling borrowed shares of stocks, called equities, anticipating that the stocks' prices will decline, and the same numbers of borrowed shares can be repurchased at lower prices.

[6] The Firm Hedge is not hedging against any specific investment. Instead, it mitigates firm risk in the event of an economic downturn by betting against the market.

[7] The S&P 500 is a stock market index which tracks the performances of 500 of the largest publicly traded U.S. companies. It serves as a key indicator of the U.S. stock market and economy, similar to the Russell 2000 ETF (IWM) and the China Large Cap ETF (FXI). Investors cannot own or trade an index as all it does is take a measure of the market. Instead, companies can buy or create index funds or ETFs. ETFs are a type of investment fund that holds a collection of assets, such as stocks, bonds, or other securities like indexes. ETFs trade like stocks throughout the day on an exchange. This allows investors to buy and sell ETFs at any time during the market's trading hours. FXI, for example, is an ETF that provides exposure to the FTSE China 50 index and serves as an indicator of China's equity market. An index fund, by contrast, can be bought and sold only at the end of each trading day.

[8] SPX is the ticker shorthand for the S&P 500. It is not in and of itself a tradable fund; however, there are various SPX ETFs and index funds on the market.

petitioner and respondent agree it was common for SIG to change the form in which its Firm Hedge positions were held. Firm Hedge positions have been held in portfolio swaps, individual swaps, and in different prime brokerage accounts[9] from different providers over time both before and after the tax year at issue.

III.   *The Transaction at Issue*

Until 2010 the Firm Hedge was held within a prime brokerage account with Merrill Lynch. Merrill Lynch required a 15% margin—i.e., cash or collateral—for the short position indexes held in the Firm Hedge. In 2010 Morgan Stanley Co. approached SIG with a twofold proposition: first, to move the Firm Hedge from Merrill Lynch to one or more of Morgan Stanley Co.'s foreign-owned entities in exchange for a lower margin rate; second, to enter into a series of agreements that would structure a complex portfolio swap centered upon four specific Swiss equities (Transaction).[10] Jeff Cohen, SIG's equity finance group manager, served as the lead for the Transaction. As part of the decision-making process on whether to enter into the Transaction, SIHP directed Mr. Cohen to create a preliminary pretax profit and loss analysis.

On April 5, 2010, Mr. Cohen conducted an initial expected pretax profit and loss analysis (Cohen's 2010 Analysis) of the proposed Transaction. The proposal involved the acquisition of long positions in four specific equities based in Switzerland: (1) Novartis (Ticker Symbol: NOVN VX); (2) Roche (ROG VX); (3) Nestle (NESN VX); and (4) Swisscom (SCMN VX) (collectively, Swiss Equities). The core portfolio within the Transaction would additionally include the Firm Hedge. The analysis of the prospective deal and the inclusion of the Firm Hedge was not unusual. Mr. Cohen was often responsible for finding the most cost-effective placements for Firm Hedge positions and frequently placed the Firm Hedge into portfolio swaps when it would lower overall financing costs.

---

[9] A "prime brokerage" account is a bundled set of brokerage services that operate similarly to the services received by an individual at brokerage firms such as Robinhood or Schwab.

[10] A portfolio swap is a type of equity swap. An equity swap is an over-the-counter instrument created by a broker-dealer firm that gives its counterparty client exposure to a long or short position in a security. A single equity swap deals with one cashflow, or "underlier," from a single stock. In a portfolio swap the exchanged cashflow is a formula based on multiple stock indices. Portfolio swaps offer exposure to multiple securities such as indices, individual equities, or fixed income products.

Cohen's 2010 Analysis anticipated that the trade would be an over-the-counter transaction that would not be listed on any financial exchange. He estimated the cost of dividends payable on the short positions of the Swiss Equities to be up to 78% of the anticipated gross dividends. Cohen's 2010 Analysis did not account for the necessary trade costs associated with required foreign currency transactions but did account for Swiss withholdings of 15%.

Mr. Cohen concluded his analysis by estimating a net profit of $974,347 on the Transaction as follows:

| | |
|---|---|
| Gross Dividend (100%) | $39,189,275 |
| Less withholdings (35%) | (13,716,246) |
| Net Dividend Due (65%) | 25,473,029 |
| Potential Reclaim Amount (20%) | 7,837,855 |
| Dividend Payable on Swap | (30,567,635) |
| Trade Costs | (1,768,902) |
| Net Trade PNL | $974,347 |

A.    *Brokerage Agreements for the Transaction*

On April 13, 2010, in order to facilitate the Transaction, SIHP entered into an International Swaps and Derivatives Association (ISDA) master agreement with Morgan Stanley & Co. International plc (Morgan Stanley International) and Morgan Stanley Co. (collectively, Morgan Stanley).[11]

---

[11] Morgan Stanley International is a London-based legal entity, regulated by the Financial Conduct Authority in the United Kingdom. Morgan Stanley Co. is the U.S. affiliate of Morgan Stanley International. SIG and Morgan Stanley Co. entered into a bridge agreement under which Morgan Stanley International was able to treat SIG's assets held in its U.S. prime brokerage account as collateral. SIG, Morgan Stanley International, and Morgan Stanley Co. all signed the ISDA, which determined the specific margin requirements for the Swiss Equities as the Transaction progressed.

Before the Transaction the Firm Hedge with Merrill Lynch required margin rate collateral equal to 15% market value of the Firm Hedge. The ISDA with Morgan Stanley offered a significantly lower rate of 6.5% collateral for both the Firm Hedge and the indexes. Each smaller transaction entered into under the ISDA master agreement was documented by a trade confirmation which set the terms and conditions of the specific transactions. The agreements facilitated (1) the purchase of equities; (2) the formation and maintenance of the portfolio; and (3) operational efficiencies across the two components. Taken in sum, these agreements make up the Transaction, which held the Swiss Equities in prime brokerage accounts, and facilitated the Transaction, which exposed SIHP to a portfolio of positions through the Firm Hedge.

SIHP purchased the Swiss Equities through Credit Suisse to be delivered to SIHP's prime brokerage account with Morgan Stanley. SIHP then held the Swiss Equities over their respective ex-dividend dates. At the same time that SIHP[12] acquired the Swiss Equities, SIHP entered into a portfolio swap arrangement with Morgan Stanley. This portfolio swap provided SIHP with identical short positions in each of the four Swiss Equities and other market indices.

The ISDA Agreement with Morgan Stanley facilitated the Transaction, which occurred from April 2010 until October 2013. The Transaction was styled as an equity portfolio swap holding short positions[13] in the Swiss Equities and the Firm Hedge, while SIHP and Morgan Stanley held identical long positions in the Swiss Equities within a prime brokerage account.

---

[12] As noted CVIH is a wholly owned subsidiary of SIHP and is a disregarded entity for U.S. federal income tax purposes. Thus, SIHP is treated as directly engaging in the Transaction at issue.

[13] Holding a short position in stocks is essentially the practice of selling borrowed shares of stocks, called equities, anticipating that the stocks' price will decline, and the same number of shares can be repurchased at a lower price. Thus a "short" position in stock is only profitable when the value of that stock falls while a "long" position is profitable when the value rises. As respondent's expert Dr. DeRosa said at trial: "[L]ong means you own it. Short means that you sold it and you don't own it, you just borrowed the shares." An entity that holds a short position in an equity does not receive a dividend when the equity pays a dividend. Instead, when the dividend is paid, an entity holding a short position on the dividend-paying equity is required to make a payment to the counterparty known as a "substitute dividend."

B.     *Dividends Received from the Swiss Equities*

SIHP expected to receive dividends from the Swiss Equities in the long position. SIHP also expected to pay a portion of those dividends (approximately 78%) to Morgan Stanley through the Transaction. The expected revenue equals the difference between the dividends received by SIHP for the Swiss Equities and the amount of the substitute dividends that SIHP expected to pay to Morgan Stanley as part of the Transaction.

In January of 2012 Mr. Cohen conducted another expected pretax profit and loss analysis (Cohen's 2012 Analysis) of the proposed Transaction. Cohen's 2012 Analysis, like Cohen's 2010 Analysis, could be considered incomplete, as Mr. Cohen did not account for the costs associated with the foreign currency transactions necessary to facilitate the trade. Cohen's 2012 Analysis projected profits and losses for only two of the four Swiss Equities, the quantity and pricing of which do not reflect the actual agreements later entered into with Morgan Stanley. Moreover, Cohen's 2012 Analysis included Swiss taxes in the profit calculation. Despite these issues Cohen's 2010 Analysis and Cohen's 2012 Analysis (collectively, Cohen's Analyses) were relied upon by SIHP and later served as the basis for each expert report.

For the tax year at issue SIHP reported $170,764,863 in QDI from the Swiss Equities, which breaks down as follows:

| Description | Dividend Record Date | Dividend Payment Date | Dividend Amount |
|---|---|---|---|
| Nestle SA (NESN VX) | 4/25/2012 | 4/26/2012 | $64,871,330 |
| Novartis AG (NOVN VX) | 2/29/2012 | 3/1/2012 | 45,005,029 |
| Roche Holding AG (ROG VX) | 3/12/2012 | 3/13/2012 | 55,968,147 |
| Swisscom (SCMN VX) | 4/12/2012 | 4/13/2012 | 4,920,358 |
| **Total**: | | | **$170,764,863** |

SIHP transferred $130,175,828 in substitute dividends to Morgan Stanley for 2012.[14] This amount was calculated by multiplying the dividends that SIHP received on each of the Swiss Equities by the weighted average dividend ratio for each of the four Swiss Equities as negotiated with Morgan Stanley. In sum, SIHP was entitled to $40,589,035 in net dividends from its long position in the Swiss Equities.

### C. *Taxes Withheld by Swiss Federal Tax Authority*

During the tax year at issue foreign taxes of $59,767,702 were withheld by the Swiss Federal Tax Authority (SFTA)[15] on dividends received from the Swiss Equities. The $59,767,702 of tax withheld breaks down as follows:

| Description | Dividend Record Date | Dividend Payment Date | Foreign Tax Withheld |
|---|---|---|---|
| Nestle SA (NESN VX) | 4/25/2012 | 4/26/2012 | $22,704,965 |
| Novartis AG (NOVN VX) | 2/29/2012 | 3/1/2012 | 15,751,760 |
| Roche Holding AG (ROG VX) | 3/12/2012 | 3/13/2012 | 19,588,851 |
| Swisscom (SCMN VX) | 4/12/2012 | 4/13/2012 | 1,722,125 |
| **Total**: | | | **$59,767,702** |

Under the U.S.-Swiss Income Tax Treaty (Swiss Treaty) nonresidents of Switzerland can file a "reclaim" or refund request to the SFTA to obtain a return of prior Swiss tax withholdings, effectively reducing the withholding from 35% to 15% of the gross dividends received (or a reduction of 20%), if the dividend is from a Switzerland domiciled entity. *See* Convention for the Avoidance of Double Taxation

---

[14] Under the ISDA and Transaction SIHP was entitled to retain only 22% of the gross dividend, and Morgan Stanley was due 78%; hence the substitute dividend payment back to Morgan Stanley by SIHP of $130 million in 2012.

[15] Switzerland imposes a 35% withholding tax on gross dividends paid by the Swiss Equities.

with Respect to Taxes on Income, Switz-U.S., art. 10, Oct. 2, 1996, T.I.A.S. No. 97-1219; I.R.S. Notice 2011-64, 2011-37 I.R.B. 231.

On or around March 2, 2012, and again on December 10, 2012, SIHP submitted Forms 82 E, Claim for Refund, to the SFTA, claiming a refund of 20% of the gross dividends SIHP (through CVIH) received from the Swiss Equities during tax years 2010 and 2011. To date, the SFTA has not accepted CVIH's claim for refund for tax years 2010, 2011, and 2012.

SIHP reported $25,614,729 in foreign tax credit on its tax return for the tax year at issue related to the withheld Swiss taxes. This amount reported by SIHP equals 15% of $170,764,863—the gross dividend amount SIHP reported as received from the Swiss Equities during the tax year at issue. Notably, this amount was reported before SIHP received confirmation of the 2012 reclaim, a type of refund request with SFTA, pursuant to the Swiss Treaty.

## IV.    *SIHP's FPAA*

SIHP timely filed its Form 1065, U.S. Return of Partnership Income, for the tax year at issue with the IRS's Ogden, Utah, service center. Several years later, on December 5, 2019, respondent issued his FPAA to the tax matters partner of SIHP for the tax year at issue. Petitioner disputes all adjustments made in the FPAA, and on July 10, 2020, Explorer Partner Corp. in its capacity as a notice partner of SIHP filed its Petition with this Court, pursuant to section 6226(d)(1).

## V.    *Testimony Presented at Trial*

### A.    *Petitioner's Expert Luc Faucheux*

Luc Faucheux is a lecturer at the University of Miami Herbert School of Business and has served as an employee and manager of various international trading firms since 2000. Dr. Faucheux has provided expert witness testimony in five previous cases and is recognized by this Court as an expert in equity swaps and equity portfolio swaps.

Petitioner called Dr. Faucheux to rebut the expert reports of respondent's experts, David F. DeRosa and Israel Nelken. In his rebuttal Dr. Faucheux asserts that respondent's experts incorrectly state that a swap that provides exposure to multiple securities or indexes is essentially a collection of individual swaps on those same

components. His report detailed key characteristics of the Transaction as well as the significant financial consequences SIHP would have faced had it chosen to structure the transaction as a collection of single-equity swaps instead.

B.    *Petitioner's Expert Michael Cragg*

Michael Cragg is a senior partner at Keystone Strategy and a former economics professor at Columbia University and the University of California, Los Angeles. He has served on the faculty of the World Bank Training Programs, held an NIH Fellowship at RAND, and was a senior research economist at the Milken Institute in Santa Monica, California. Dr. Cragg previously testified on behalf of the Government and taxpayers on intercompany financings, joint ventures, and partnerships and acted as the lead expert in high profile matters.

This Court recognized Dr. Cragg as an expert in financial economics for this proceeding. Dr. Cragg's report focused on expected pretax economic profit. Dr. Cragg's analysis of expected pretax profits for 2012 was based on the actual results from CVIH's bank statements and broker statements, and it included an expected total gross dividend of $170,215,970 from the Swiss Equities in 2012. Dr. Cragg asserts that he used this data, rather than Cohen's 2010 Analysis data, because it was derived from the actual amounts and terms in each executed trade as agreed upon in advance by SIHP and Morgan Stanley. Dr. Cragg also calculated that the total substitute dividend payments SIHP expected to owe in 2012 was $130,175,828. Thus, Dr. Cragg in his report stated that SIHP expected to earn approximately $32 million on a pretax basis in net dividends from the Swiss Equities.

In rebuttal Dr. Cragg argues that respondent's experts, Dr. Nelken and Dr. DeRosa, based their conclusions on two specific errors, leading to absurd results. The first error Dr. Cragg alleges is that both experts included tax in their "pre-tax" calculations. This error, Dr. Cragg argues, was compounded by including the costs of each transaction without including the corresponding benefit in the pretax profit and including costs that were not contingent upon the transactions. The second error Dr. Cragg alleges is regarding Dr. Nelken's and Dr. DeRosa's use of Cohen's 2010 Analysis rather than the data produced by the arrangements themselves. Dr. Cragg argues that such use was inappropriate as it did not reflect the ultimate Transaction and thus would not meet the requirements of Treasury Regulation § 1.246-5(c)(1)(vi) (Anti-Abuse Rule).

C.    *Petitioner's Expert James Kermisch*

James Kermisch is the founder and chief executive officer of JAK Advisory with more than 34 years of experience in alternative asset management and investment banking in the United Kingdom and the United States, specifically with Morgan Stanley. In his report Mr. Kermisch explained how various investment options that achieve equivalent financial exposure are not, in substance, interchangeable. The report placed significance on the investor's choice of instrument, which includes factors such as liquidity requirements, trading flexibility, risk tolerance, relative cost, tax efficiency, investment horizon, and regulatory considerations. Mr. Kermisch's report emphasized the specific benefits of a portfolio equity swap transaction.

D.    *Petitioner's Expert Thomas J. Brennan*

Thomas J. Brennan is a professor of law at Harvard Law School and a former strategist in the Capital Markets Strategies Group at Goldman, Sachs & Co. This Court recognized him as an expert in mathematics, financial analysis and economics. Dr. Brennan's report focused on the first test of the relevant Anti-Abuse Rule, namely Treasury Regulation § 1.246-5(c)(1)(vi)(A) (Virtual Tracking Test).

Dr. Brennan was asked by petitioner to independently evaluate whether the value of the equity portfolio swap was reasonably expected to "virtually track" changes in the value of SIHP's stock holdings or any portions of SIHP's stock holdings. In Dr. Brennan's opinion there are three key attributes that inform the application of the Virtual Tracking Test. First, the Virtual Tracking Test is distinct from actual tracking. Second, the Virtual Tracking Test involves a comparison of changes in the value of a taxpayer's stock holdings with changes in the value of the entirety of the stocks reflected in a position. Third, the Virtual Tracking Test requires the change in the value of the position to be reasonably expected to be nearly the same as the change in the value of the taxpayer's stock holdings. In Dr. Brennan's opinion, this expected difference in change in values should be no greater than 5% to be considered "virtual tracking."

On the basis of this analysis he concludes that the value of the entirety of the stock reflected in SIHP's Transaction was not reasonably expected to "virtually track" changes in value of the Swiss Equities. Therefore, Dr. Brennan opines that the Anti-Abuse Rule cannot be applied to reduce SIHP's holding period in the Swiss Equities.

E.     *Respondent's Expert David DeRosa*

David DeRosa holds an undergraduate degree in economics and a Ph.D. in economics and finance from the University of Chicago. Dr. DeRosa is currently on the boards of directors of hedge fund groups that trade equity swaps. His duties include oversight of the businesses, by, for instance, hiring auditors, hiring service providers, signing financial statements, signing agreements such as ISDA agreements and support documents, generally being aware of what trading is occurring, understanding strategies, and signing confirmations. Dr. DeRosa has been recognized by other federal courts as an expert in derivatives, which include equity swaps, derivatives risk management, options and foreign exchange trading, economics and finance, statistics, economics and finance with real world applications, economic analysis, and the hedge fund industry.

This Court recognized Dr. DeRosa as an expert in economics, finance, derivatives, and equity swaps for this proceeding. Dr. DeRosa's analysis for respondent relied upon Cohen's Analyses and focused on the control exercised by CVIH to open and close transactions on individual securities at will. Dr. DeRosa argued that SIHP's control over the Transaction demonstrated that it held multiple positions, referencing a single stock or index, rather than a single position. He based this opinion on the fact that SIHP selected which Swiss equities to include in the Transaction and made decisions regarding the addition and subtraction of stock components and when and how to execute the trades.

F.     *Respondent's Expert Israel Nelken*

Israel Nelken has a bachelor of science in mathematics and computer science from Tel Aviv University, and a master's and a Ph.D. in computer science from Rutgers University. From 1996 to the present Dr. Nelken has owned a firm called Super CC or Super Computer Consulting that manufactures software to value financial instruments including exotic options, derivatives, and convertible bonds. Dr. Nelken was on the new product development committee at the Chicago Board Options Exchange and is currently a director on the Chicago Futures Exchange and an advisory board member for KnectIQ, a Minneapolis-based cybersecurity firm. This Court recognized Dr. Nelken as an expert in the application of mathematical principles to the analysis of financial instruments for this proceeding.

Dr. Nelken reviewed Cohen's Analyses and concluded that they were flawed for a variety of reasons. Specifically, he opines that Cohen's 2010 Analysis understated slippage costs, short hedge costs, and dividend rates for dividends owed on borrowed shares, and it failed to consider the risk in not receiving the 20% Swiss reclaim or the costs associated with a delay in repayment. Despite these flaws, Dr. Nelken also relied upon Cohen's Analyses and used them as the basis for his report.

Dr. Nelken argued that SIHP neglected to use data from real trades conducted in 2010 and 2011 when it conducted its final pretax analysis in 2012. His rebuttal report concluded that SIHP anticipated tax savings, including QDI and foreign tax credits (FTC), of at least $25 million. Ultimately, Dr. Nelken concluded that the actual profit on the Swiss Equities for years 2010 and 2012 reflected losses of more than $42 million and nearly $120 million, respectively. In his rebuttal Dr. Nelken contends that the referenced $10.7 million in tax saving was specific to tax year 2010, and that he would expect 2012 to have proportionally larger tax savings of at least $25 million. Dr. Nelken does not, however, provide an estimated amount or computation to reflect this figure.

OPINION

The ultimate issues before the Court are whether SIHP is entitled to QDI treatment for the gross dividends received from the Swiss Equities, along with FTC for taxes paid to Switzerland on those same dividends, for the tax year at issue.

I.   *Burden of Proof*

Generally, the Commissioner's determinations in an FPAA are presumed correct, and the party challenging the FPAA bears the burden of proving those determinations are erroneous. *See* Rule 142(a)(1); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485 (2013); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996).

However, the record before us permits the resolution of all issues in dispute on a preponderance of the evidence. *See Facebook, Inc. & Subs. v. Commissioner*, 164 T.C. 194, 244 (2025); *Kimberlin v. Commissioner*, 128 T.C. 163, 171 n.4 (2007).

II.    *Summary of the Parties' Arguments*

Respondent argues that the dividends received from the Transaction are ineligible for QDI treatment, contending that all risk of loss was systematically diminished by holding a position with respect to substantially similar or related property (SSRP), as defined by the rules provided in section 246(c)(4) and accompanying Treasury regulations. Moreover, on the basis of the corresponding reduction in the holding period that would ensue from the application of section 246(c)(4), respondent argues that SIHP is likewise not entitled to FTC.

SIHP's systematic removal of risk (i.e., hedging), respondent argues, flies in the face of congressional intent. Congress enacted section 246(c) to prevent avoidance schemes in which shareholders held both long and short positions in the same stock over the recorded dividend date, an action which when legal is generally referred to as "dividend arbitrage."[16] When enacting section 246(c), Congress sought to prevent taxpayers from obtaining favorable tax treatment in these types of transactions by ensuring that taxpayers held the long stock position for a minimum holding period at the risk of the market—thus preventing risk-free tax arbitrage—and denying tax-favored treatment for dividends—i.e., QDI—where taxpayers held both long and short positions in a dividend-paying stock. *See* S. Rep. No. 85-1983, at 28–29, 139–40 (1958), *reprinted in* 1958 U.S.C.C.A.N. 4791, 4817–18, 4929–30.

Respondent first raises the substance-over-form doctrine, namely that the substance of the Transaction fails to match its form and should be recharacterized accordingly. Under respondent's argument, the Transaction should be recharacterized from a single, unitary position reflecting a portfolio of stocks to a collection of separate individual short positions, each referencing a single stock or index. The result of such disaggregation is that Treasury Regulation § 1.246-5(c)(1)(v) would apply to the Transaction rather than Treasury Regulation § 1.246-5(c)(1)(ii) through (iv). If tested as a collection of separate positions, rather than as a single position, the Transaction decidedly concerns SSRP and the holding period of each stock, consequently, would be reduced. Respondent also contends the Transaction violates the "Substantial Overlap Test" set forth in Treasury Regulation § 1.246-5.

---

[16] Dividend arbitrage is an investment strategy that centers around simultaneously buying long and short positions in common stock shortly before and after payment of a dividend. This allows the investor to collect the dividend payment while hedging against potential losses in the stock's value.

Next, if the Transaction does not involve SSRP under the "Substantial Overlap Test," respondent then contends it would violate the general "Anti-Abuse Rule" likewise found in Treasury Regulation § 1.246-5.

Petitioner argues that the dividends from the Swiss Equities qualify for QDI treatment because the Transaction, as a whole, complies with the tests found in Treasury Regulation § 1.246-5(c)(1)(iii) and (iv). Petitioner contends that respondent should not be permitted to raise the "substance over form doctrine" and change the Transaction by looking only to the Swiss Equities. Petitioner contends that when the entire portfolio of investments with Morgan Stanley is considered, including the Swiss Equities, the Firm Hedge, and other indexes, it maintained the necessary market risk as mandated by section 246(c) and thus satisfied the 60-day holding requirements necessary to claim QDI tax treatment. *See* I.R.C. § 1(h)(11)(B)(iii). Finally, petitioner contends that SIHP is entitled to a foreign tax credit of $25,614,729 under section 901(k).

III. *Legal Background*

QDI preferential tax treatment generally includes any dividend from a domestic corporation or a qualified foreign corporation. *See* I.R.C. § 1(h)(1), (11). A qualified foreign corporation is any foreign corporation (i) incorporated in a possession of the United States, (ii) eligible for benefits under a comprehensive income tax treaty with the United States which is satisfactory to the IRS and includes an exchange of information program, or (iii) the stock of which is readily tradable on an established securities market in the United States. I.R.C. § 1(h)(11)(C)(i) and (ii). The parties agree that each of the Swiss Equities was issued by a company residing in Switzerland, and each of those Swiss companies was a "qualified foreign corporation" within the meaning of section 1(h)(11)(C)(i)(II) and Notice 2006-101, 2006-2 C.B. 930. The dispute, rather, lies over calculation of the holding period regarding SIHP's positions in the Swiss Equities.

In order to obtain QDI treatment a taxpayer must hold the equity for a requisite holding period. *See* I.R.C. § 1(h)(11)(B)(iii). The holding period for QDI treatment adopts by reference the exclusionary holding period provisions provided in section 246(c). *See* I.R.C. § 1(h)(11)(B)(iii)(I).

Sections 1(h)(11)(B)(iii)(I) and 246(c) specify the number of days needed to hold stock to satisfy holding requirements but also contain

important restrictions and exceptions. As relevant here, section 246(c)(4)(C) provides that the calculated holding period for QDI treatment is tolled for any period in which, under regulations prescribed by the Secretary, a taxpayer has diminished his risk of loss by holding one or more other positions with respect to SSRP. Treasury Regulation § 1.246-5 provides rules for applying section 246(c)(4)(C).

Respondent relies on subparagraph (C) of section 246(c)(4) and the relevant regulations thereunder. Petitioner contends the Secretary issued Treasury Regulation § 1.246-5 to provide "bright-line rules" for determining when such diminished risk exists and that, throughout the Swiss Equities trades, SIHP has consistently complied with these rules as prescribed. Respondent, on the other hand, contends SIHP has violated Treasury Regulation § 1.246-5(b) as, if both the Swiss Equities and the Transaction are considered, SIHP has diminished its risk of loss and its position consists of SSRP.

IV.    *Analysis*

A.    *Background on Treasury Regulation § 1.246-5*

Treasury Regulation § 1.246-5(a) provides that the holding period of stock for purposes of the dividends received deduction is reduced for any period in which a taxpayer has diminished its risk of loss by holding one or more other positions with respect to SSRP. A taxpayer has diminished its risk of loss on its stock by holding positions with respect to SSRP if changes in the fair market values of the stock and the positions are reasonably expected to vary inversely. *See id.* para. (b)(2). A position with respect to property is an interest (including a futures or forward contract or an option) in property or any contractual right to a payment, whether or not severable from stock or other property. *See id.* para. (b)(3). Treasury Regulation § 1.246-5(b)(1) provides that SSRP is determined according to facts and circumstances of each case.

Treasury Regulation § 1.246-5(c)(1) provides special rules for the treatment of positions that reflect the value of more than one stock. In general, positions that reflect the value of a portfolio of stocks are treated under the rules of paragraph (c)(1)(ii) through (iv) of this section (Portfolio Rules). A portfolio of stocks for this purpose is any group of stocks of 20 or more unrelated issuers. *See* Treas. Reg. § 1.246-5(c)(1). Positions that reflect the value of more than one stock but less than a portfolio are treated under the rules of paragraph (c)(1)(v) of this section (Nonportfolio Rules).

Portfolio Rules determine that a position involves SSRP to the stocks held by the taxpayer only if the position and the taxpayer's holdings substantially overlap as of the most recent testing date. *See* Treas. Reg. § 1.246-5(c)(1)(ii). A position may be substantially similar or related to a taxpayer's entire stock holdings or a portion of a taxpayer's stock holdings. *See id.* To determine whether a position and the taxpayer's stock holdings "substantially overlap" under the Portfolio Rules, the Secretary set forth a mechanical, bright-line test, sometimes referred to as the "Substantial Overlap Test." Treasury Regulation § 1.246-5(c)(1)(iii) provides as follows:

(A) *Step One.* Construct a subportfolio (the Subportfolio) that consists of stock in an amount equal to the lesser of the fair market value of each stock represented in the position and the fair market value of the stock in the taxpayer's stock holdings. (The Subportfolio may contain fewer than 20 stocks.)

(B) *Step Two.* If the fair market value of the Subportfolio is equal to or greater than 70 percent of the fair market value of the stocks represented in the position, the position and the Subportfolio substantially overlap.

(C) *Step Three.* If the position does not substantially overlap with the Subportfolio, repeat Steps One and Two (paragraphs (c)(1)(iii)(A) and (B) of this section) reducing the size of the position. The largest percentage of the position that results in a substantial overlap is substantially similar or related to the Subportfolio determined with respect to that percentage of the position.

The above regulation provides rules for determining whether a position and a taxpayer's stock holdings or a portion of a taxpayer's stock holdings substantially overlap. The test comprises three steps. First, the taxpayer is to construct a "Subportfolio" consisting of stock in an amount equal to the lesser of the fair market value of (i) each stock represented in the portfolio (Portfolio Position) and (ii) the stock in the taxpayer's stock holdings.

Second, if the fair market value of the Subportfolio is equal to or greater than 70% of the fair market value of the stocks represented in the Portfolio Position, the Portfolio Position and the Subportfolio substantially overlap. *Id.* The regulations provide that the Substantial Overlap Test must be applied on any testing date, which is defined to mean

any day on which the taxpayer purchases or sells any stock if the fair market value of the stock or the fair market value of substantially similar or related property is reflected in the position, any day on which the taxpayer changes the position, or any day on which the composition of the position changes.

*Id.* subdiv. (iv).

Finally, if the Portfolio Position does not substantially overlap with the Subportfolio, the taxpayer is to then repeat the steps after reducing the size of the position, while maintaining the relative proportions of each stock, to see whether a portion of the Subportfolio substantially overlaps with the reduced Portfolio Position. *See id.* subdiv. (iii)(C).

The Nonportfolio Rules apply when a position reflects the fair market value of more than one stock but not of a portfolio of stocks (Nonportfolio Position); therefore, when testing for SSRP it is treated as a separate position with respect to each of the stocks the value of which the position reflects.[17]

B.      *Substance Over Form*

The substance-over-form doctrine originated in *Gregory v. Helvering*, 293 U.S. 465 (1935). The Supreme Court again recognized the substance-over-form doctrine in *Frank Lyon Co.*, where it noted that "[t]he Court has never regarded 'the simple expedient of drawing up papers' . . . as controlling for tax purposes when the objective economic realities [of the transaction] are to the contrary." *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) (quoting *Commissioner v. Tower*, 327 U.S. 280, 291 (1946)). Under the substance-over-form doctrine, the Commissioner and the courts may recharacterize a transaction in accordance with its substance if the substance of the transaction is demonstrably contrary to the form. *Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d 221, 230 n.12 (3d Cir. 2002), *aff'g* 115 T.C. 43 (2000).

---

[17] The parties do not dispute that if the Transaction is considered as a whole, it passes the Substantial Overlap Test and the holdings are thus not considered SSRP. As discussed above, however, respondent contends that application of the test to the Transaction is inappropriate and that the substance-over-form doctrine should be applied to disaggregate SIHP's position when applying this test.

The substance-over-form doctrine is a common law doctrine. *See Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1521 (10th Cir. 1991) ("The step-transaction doctrine developed as part of the broader tax concept that substance should prevail over form." (quoting *Am. Potash & Chem. Corp. v. United States*, 399 F.2d 194, 207 (Ct. Cl. 1968))); *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1549 (9th Cir. 1987) ("The economic substance factor involves a broader examination of whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction."), *aff'g* T.C. Memo. 1986-23. We have said that this doctrine, and others like it, require "a searching analysis of the facts to see whether the substance of the transaction is different from its form or whether the form reflects what actually happened." *See Andantech L.L.C. v. Commissioner*, T.C. Memo. 2002-97, 83 T.C.M. (CCH) 1476, 1501 (citing *Harris v. Commissioner*, 61 T.C. 770, 783 (1974)), *aff'd in part and remanded*, 331 F.3d 972 (D.C. Cir. 2003).

The Commissioner specifically may challenge the purported tax benefits of a transaction where the substance of a particular transaction produces tax results inconsistent with the form embodied in the underlying documentation and has done so regularly across multiple courts of appeals. *See, e.g.*, *Feldman v. Commissioner*, 779 F.3d 448, 457 (7th Cir. 2015) (disregarding sham loan designed to avoid income tax), *aff'g* T.C. Memo. 2011-297; *Southgate Master Fund, L.L.C. ex rel. Montgomery Cap. Advisers, LLC v. United States*, 659 F.3d 466, 491–92 (5th Cir. 2011) (disregarding sham partnership); *Rogers v. United States*, 281 F.3d 1108, 1116–18 (10th Cir. 2002) (recharacterizing a secured loan that had no likelihood of ever being repaid as a sale). However, there has yet to be a case that outright holds tax-avoidance alone may nullify an otherwise Code-compliant and substantive set of transactions. *See Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779, 787 (6th Cir. 2017), *rev'g* T.C. Memo. 2015-119. After all, taxpayers may lawfully arrange their affairs to keep taxes as low as possible. *Gregory v. Helvering*, 293 U.S. at 469–70.[18]

To qualify for the tax benefits at issue petitioner must establish that SIHP held the Swiss Equities for the requisite holding periods, here 60 days, set forth in section 1(h)(11)(B)(iii) or 901(k)(1)(A). Each section

_____

[18] Judge Learned Hand mentioned in *Helvering v. Gregory*, 69 F.2d 809, 810 (1934), the case that gave rise to the substance over form doctrine, there is "not even a patriotic duty to increase one's taxes."

determines the applicable holding periods according to section 246, which provides restrictions and exceptions. In general, these holding period requirements are "bright-line" rules. Congress has set forth a minimum number of days that a taxpayer must own stock in a given period for QDI treatment. The required holding period reflects a choice by Congress to set the boundaries of a particular tax treatment. Here, there is no dispute SIHP held the Swiss Equities for more than 60 days; rather the dispute lies in whether this period should be reduced because the property is deemed SSRP under section 246(c)(4)(C).

Congress was primarily concerned with taxpayers effectively holding stock in form but without bearing any economic risk of loss by engaging in hedging and similar transactions. *See* Robert Willens, *New Decision Expands Availability of Dividends Received Deduction*, 74 J. Tax'n 276 (1991).

Because the federal tax system "is, and always has been, based on statute," *Santander Holdings USA, Inc. v. United States*, 844 F.3d 15, 21 (1st Cir. 2016), we look first to the text of the Code, *see Gregory v. Helvering*, 293 U.S. at 469–70. In doing so the Court considers the "objective economic realities of [the] transaction rather than . . . the particular form the parties employed." *Frank Lyon Co.*, 435 U.S. at 573.

Respondent alleges that under section 246(c)(4)(C), risk of loss has been diminished under the Transaction. Section 246(c)(4)(C) provides that the holding period of stock is appropriately reduced for any period in which "a taxpayer has diminished his risk of loss by holding [one] or more other positions with respect to [SSRP]." That section provides that any period for which a taxpayer has diminished its risk of loss on stock by holding one or more positions with respect to SSRP will not be counted as part of the holding period. *Id.*[19]

Congress does not define SSRP or provide an answer as to when a taxpayer has diminished its risk of loss. Instead, it authorizes the Secretary to promulgate regulations. *See* I.R.C. § 246(c)(4)(C). In 1995 the Secretary promulgated a final regulation, *see* Treas. Reg. § 1.246-5, providing the rules for determining when a taxpayer has diminished its risk of loss by holding positions with respect to SSRP. A "[d]iminished

---

[19] Congress expressly enacted section 246(c) to prevent tax avoidance and deny tax benefits where taxpayers were long and short with respect to substantially identical stock or securities (or otherwise under obligation to make corresponding payments with respect to these securities) over the dividend payment date. *See* S. Rep. No. 85-1983, at 28–29, 139–40, 1958 U.S.C.C.A.N. at 4817–18, 4929–30.

risk of loss" occurs when a taxpayer holds positions with respect to SSRP if changes in the fair market value of the stock and the positions are reasonably expected to vary inversely. *Id.* para. (b)(2).

Respondent first argues that petitioner incorrectly uses a portfolio when the substance of the Transaction actually reflects a nonportfolio position. The regulation defines "position" to mean an interest (including a futures or forward contract or an option) in property or any contractual right to a payment, whether or not severable from stock or other property. *Id.* para. (b)(3). A position does not include traditional equity rights to demand payment from the issuer, such as the rights traditionally provided by mandatorily redeemable preferred stock, and it can reflect a single stock or the value of a portfolio of stocks. *Id.* paras. (b)(3), (c)(1)(i). Consequently, a position may be substantially similar or related to a taxpayer's entire stock holdings or a portion of a taxpayer's stock holdings. *Id.* para. (c)(1)(ii).

Critically for the facts before us here, a portfolio is defined to be any group of stocks of 20 or more unrelated issuers. Treas. Reg. § 1.246-5(c)(1)(i). Treasury Regulation § 1.246-5 prescribes both a Nonportfolio Rule (a position referencing a single stock) and a Portfolio Rule (any group of stocks of 20 or more unrelated issuers) to test whether a position is SSRP to stocks held by a taxpayer. *Id.* para. (c)(1)(i), (v).

It is undisputed that the Transaction consisted of stocks of 20 or more unrelated issuers.[20] Respondent contends that the four Swiss Equities should be disaggregated from the position, i.e., remove the Firm Hedge and be treated as separate positions for purposes of Treasury Regulation § 1.246-5. The basis of respondent's argument lies in the more static nature of the indexes contained in the Firm Hedge as compared to the more regulated Swiss Equities. Respondent argues that the comparative control SIHP demonstrated over the dividend divesting Swiss Equities makes their placement in, or with, the Firm Hedge inappropriate. For this reason, respondent contends this Court may use substance over form and its related judicial doctrines to change SIHP's chosen form and later apply the Nonportfolio rules to the Transaction rather than apply the Substantial Overlap test found in the Portfolio Rules.

---

[20] An investor who purchases an SPX index fund or an ETF invests in 500 large U.S. companies in a single transaction. As the Firm Hedge includes the S&P 500, among other ETFs, the position in question thus consists of 20 or more unrelated issuers.

Petitioner argues[21] that the substance-over-form doctrine is applicable only where a transaction's substance is actually inconsistent with its form. *See, e.g.*, *Turner Broad. Sys., Inc. v. Commissioner*, 111 T.C. 315, 326 (1998) (stating that to apply the substance-over form doctrine, we are to first determine that the substance of the transaction differs from its form); *Historic Boardwalk Hall, LLC v. Commissioner*, 694 F.3d 425, 448 n.50 (3d Cir. 2012), *rev'g and remanding* 136 T.C. 1 (2011); *see also Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 230 n.12. Petitioner relies on its expert Dr. Faucheux to support its position.

We agree with petitioner and find that the inclusion of the Firm Hedge as part of the Transaction is appropriate. This Court has previously held that the form of a transaction governs its federal tax consequences when the form of the transaction and the steps taken clearly reflect its substance. *See, e.g.*, *Goudas v. Commissioner*, T.C. Memo. 1996-555, *aff'd*, 137 F.3d 368 (6th Cir. 1998). The Firm Hedge has changed form and location multiple times throughout its existence. Petitioner and respondent agree it was common for SIG to change the form in which its Firm Hedge positions were held. Firm Hedge positions have been placed in portfolio swaps, individual swaps, and in different prime brokerage accounts. Respondent specifically argues that a substance-over-form argument should be applied to the Substantial Overlap Test when testing for the SSRP. Respondent's argument hinges upon excluding the Firm Hedge as part of SIHP's overall Portfolio Position. However, to do so would require us to change the substance of the Transaction.

As Dr. Faucheux testified, it is common industry practice for different types of equities, such as the Firm Hedge, to be included in a swap arrangement, such as the Transaction, as offered by Morgan Stanley. As confirmed by Dr. Faucheux, it is likewise common practice within a portfolio swap arrangement to have the ability to actively manage the equities within the swap as SIHP so managed the Swiss Equities. We determine Dr. Faucheux's testimony to be convincing; and ultimately, we find that the Transaction at issue here consists of a conventional portfolio swap arrangement, with standard terms and

---

[21] Petitioner also asserts that any application of substance over form would be improper. We disagree. For the substance-over-form doctrine may be applied when and where appropriate. In this instance, however, and for the reasons detailed herein, we decline to apply the substance-over-form doctrine and find that SIHP's chosen form matches the substance of the Transaction.

provisions. In other words, we decline respondent's invitation to disaggregate portions of the swap arrangement—namely the Firm Hedge—for purposes of testing the Portfolio Position for SSRP under the Substantial Overlap Test.

Further, disaggregating SIHP's portfolio to that of only the Swiss Equities, while ignoring its other indexes, is contrary to Treasury's Decision, made in response to comments received, which states, in relevant part, as follows:

> The final regulations adopt this suggestion subject to an anti-abuse rule. Under the final regulations, a position that reflects the value of a portfolio is not treated as substantially similar or related to the taxpayer's stock holdings unless the *stock holdings and the portfolio* substantially overlap.

T.D. 8590, 1995-1 C.B. 15, 16 (emphasis added).

Respondent's application of substance over form would undermine the very purpose of the Substantial Overlap Test. Using the substance-over-form doctrine to disaggregate SIHP's position would accomplish precisely what the Substantial Overlap Test seeks to avoid. Disaggregating the portfolio, as respondent seeks to do, would otherwise ignore the fact that SIHP held substantial, unhedged market risk in excess of 30% of the value of any Subportfolio within its Portfolio Position. Respondent should not be permitted to use the substance-over-form doctrine to undermine the express intent behind this regulation and the method for testing. *See, e.g.*, *Benenson v. Commissioner*, 887 F.3d 511, 517 (1st Cir. 2018) ("[T]he substance-over-form doctrine does not 'tak[e] a transaction entirely outside its statutory framework,' but instead, 'helps courts read tax statutes in a way that makes their technical language conform more precisely with Congressional intent.'" (quoting *Dewees v. Commissioner*, 871 F.2d 21, 35 (1st Cir. 1989)), *rev'g Summa Holdings, Inc.*, T.C. Memo. 2015-119.

We conclude that respondent's attempt to invoke the substance-over-form doctrine seeks to apply subjective views regarding the propriety of the Transaction at issue. Respondent remains obligated to apply the SSRP regulations as written and cannot use substance-over-form principles to avoid the clear application of a highly specific rule. *See, e.g.*, *Falconwood Corp. v. United States*, 422 F.3d 1339, 1351 (Fed.

Cir. 2005) (foreclosing an application of the substance-over-form doctrine where "the regulations at issue leave no room" for it).

We think it is far more appropriate to require both parties to turn square corners and to live with the end result of SIHP's regulatory compliance. *See id.* at 1352; *Granite Tr. Co. v. United States*, 238 F.2d 670, 675 (1st Cir. 1956) (noting that applicable regulations "emphasize the rigid requirements of the section and make no allowance for the type of 'step transaction' theory advanced in this case"); *CSI Hydrostatic Testers, Inc. v. Commissioner*, 103 T.C. 398, 411 (1994) ("[W]e will apply the consolidated return regulations and the Code as written."), *aff'd per curiam*, 62 F.3d 136 (5th Cir. 1995).

The question, however, remains whether the Transaction, without altering its substance and disaggregating SIHP's Portfolio Position, is permissible under the Code and applicable regulations. Both parties point us to Treasury Regulation § 1.246-5(d) (ex. 3) for an answer. Specifically, the parties discuss whether paragraph (c)(1)(ii) and (iii) Portfolio Rules or paragraph (c)(1)(v) Nonportfolio Rules applies.

C.    *Applying Treasury Regulation § 1.246-5*

1.    *Portfolio vs. Nonportfolio Rules*

Treasury Regulation § 1.246-5(d) (ex. 3) sets forth a scenario wherein Corporation Z holds a portfolio of stocks (valued at $4,200) and acquires a short position on a publicly traded index through a regulated futures contract (RFC)[22] that reflects the value of a portfolio of stocks ($6,750). The example compares the overall value of the short Portfolio Position ($6,750) with the amount of the taxpayer's Subportfolio ($4,100); because there is less than a 70% overlap, there is no SSRP. The value of the Subportfolio is 60.74% of the value of the stocks represented in the position ($4,100/$6,750), so the position and the Subportfolio in the example do not substantially overlap.

The Substantial Overlap Test functions as a regulatory safe harbor to permit partial risk reduction in a taxpayer's Portfolio Position. While a taxpayer cannot eliminate all risk, the taxpayer's holding period will not be reduced so long as at least 30% of the short position is unhedged. This test reflects a policy choice to allow a significant amount of overlap between a Portfolio Position and a taxpayer's stock holdings—

---

[22] An RFC, also referred to as a section 1256 contract, is specifically governed by the Commodity Futures Trading Commission rules and marked to market.

up to 70%—before the overlap is considered "substantial" and the taxpayer's holding period is reduced. *See id.*

There is no dispute between the parties that Treasury Regulation § 1.246-5 is applicable. The dispute lies entirely in whether the Portfolio Rules or the Nonportfolio Rules apply. Respondent argues that SIHP's Transaction is a series of separate swaps "wrapped in legal paper" to exploit the regulations. Petitioner rebuts this argument and contends that there is no difference between the substance of SIHP's Transaction and its form. We turn to expert opinion testimony on the application of this test.

Respondent's expert Dr. DeRosa argues that the Transaction itself must be recharacterized to avoid abuse of the Code and the regulations. Respondent asserts that the substance of the transaction is more accurately that of multiple positions (each referencing a single stock or index) than a single portfolio and that, specifically, the Swiss Equities should be treated as separate positions, exclusive of the Firm Hedge position held within the Transaction. We disagree and find that respondent ignores the definitions provided by Treasury on this issue, namely portfolio vs. nonportfolio classification, *see* Treas. Reg. § 1.246-5(c)(1), and likewise misconstrues the purpose of Example 3.

We interpret regulations using canons of statutory construction, beginning with the text of the regulation, and giving effect to its plain meaning. *See Austin v. Commissioner*, 141 T.C. 551, 563 (2013). To determine plain meaning, we look to the text at issue as well as the text and design of the regulation as a whole. *AptarGroup Inc. v. Commissioner*, 158 T.C. 110, 116 (2022) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). "A regulation should be interpreted so as to avoid conflict with the statute." *Id.*

The Code and the regulations not only authorize the creation of positions in more than one stock, i.e., portfolios, but also define the term and instruct a taxpayer in how to do so. *See* Treas. Reg. § 1.246-5(c)(1)(ii). The regulations state the following:

> In general, *positions that reflect the value of a portfolio of stocks are treated under the rules of paragraphs (c)(1)(ii) through (iv) of this section*, and positions that reflect the value of more than one stock but less than a portfolio are treated under the rules of paragraph (c)(1)(v) of this section. *A portfolio for this purpose is any group of stocks of*

*20 or more unrelated issuers.* Paragraph (c)(1)(vi) of this section provides an anti-abuse rule.

*Id.* subdiv. (i) (emphasis added).

The regulations refer to positions comprising more than one but fewer than 20 unrelated issuers as "[n]onportfolio positions," to which the Substantial Overlap Test does not apply. *See id.* subdivs. (i), (v). After considering the straightforward text of the applicable regulations, we determine that SIHP has created a portfolio of stocks in both substance, a collection of 20 or more stocks, and form. This portfolio of stocks—including the Swiss Equities—is SIHP's Portfolio Position.

Our conclusion is equally supported by the statute, which provides that "a taxpayer has diminished his risk of loss by holding *1 or more other positions* with respect to substantially similar or related property." I.R.C. § 246(c)(4)(C) (emphasis added). Congress's use of plural terms confirms its intent that Treasury's (to be created) tests would apply against a taxpayer's unitary position of indexes or portfolio, and not any single indexes as respondent contends. Respondent further contends that the type of portfolio chosen by SIHP is not intended to be permitted by the legislative history or the Portfolio Rules in the final regulations. We disagree.

Respondent, supported by expert Dr. DeRosa, argues that petitioner's reliance on Example 3 is erroneous because the example intentionally uses an RFC. Unlike petitioner's position, an RFC cannot control the underlying holdings. By contrast, respondent argues that SIHP has demonstrated regular control, directly in opposition to the chosen form of the position, over the contents of the Transaction. Because the only example provided by Treasury for a portfolio of stocks uses an RFC, respondent contends that only RFCs, which lack the aforementioned control, may be permitted under section 246 and Treasury Regulation § 1.246-5.

We determine that respondent's claim regarding SIHP's control over the position is accurate. SIHP altered the securities within the Transaction some 214 times over the course of the tax year at issue; of these, 200 corresponded to the Swiss Equities' dividend dates and each trade synchronized the long and short positions, thereby generating a "100 percent hedge." However, neither party disputes at any point in the case before us that the Swiss Equities were hedged.

Respondent's briefs focus on SIHP's allegedly impermissible ability to control aspects of the position.[23] It seems unlikely that Treasury intended all portfolios to remain static as, in determining whether diminished risk of loss within a position has occurred, the regulation looks to a taxpayer's entire stock holding or portion of a taxpayer's stock holdings at a recent "testing date." Treas. Reg. § 1.246-5(c)(1)(iii).

Treasury Regulation § 1.246-5(c)(1)(iv) defines the term "testing date" to mean:

> (iv) *Testing date. A testing date is any day* on which the taxpayer purchases or sells any stock if the fair market value of the stock or the fair market value of substantially similar or related property is reflected in the position, any day *on which the taxpayer changes the position*, or any *day on which the composition of the position changes.*

(Emphasis added.)

The foregoing definition confirms that testing for diminished risk of loss under the Substantial Overlap Test is to occur on any day in which a taxpayer makes a change to the portfolio. This concept, found in the regulations, is overlooked by respondent. Simply put, the Substantial Overlap Test is triggered only when one of the above events occurs, namely, when a taxpayer buys or sells stock within its portfolio. While testing for SSRP is required at the beginning of a transaction, a taxpayer must retest the position for SSRP at every subsequent change made to the position including but not limited to changing the weights,

---

[23] Respondent begins by invoking the investor control doctrine as an analogous argument regarding the incidents of control, likening SIHP's management of the position to the actions of the taxpayer in *Webber v. Commissioner*, 144 T.C. 324, 368 (2015). There, the owner of life insurance funded by separate accounts was held to have exercised "sufficiently capacious and comprehensive" control over the separate accounts of his life insurance policies because he directed the investment manager to "buy, sell, and exchange securities and other property," particularly in companies in which the taxpayer sat on the board and in which he invested his personal accounts, individual retirement accounts, and private-equity funds. *Id.* at 350, 364. In determining whether the taxpayer owned the assets supporting the policies, the Court explained that "[t]he core 'incident of ownership' is the power to select investment assets by directing the purchase, sale, and exchange of particular securities." *Id.* at 361. Nothing before us invites us to reconsider our holding in *Webber*, and neither do we find the case to be analogous. As conceded by respondent, nothing in *Webber* addresses whether or when swaps referencing an index of stocks may be disaggregated.

adding or subtracting holdings, selling a long position, or adding a stock to the portfolio. *Id.* In summary, we determine that SIHP holds a portfolio of stocks, and accordingly, we will apply the Substantial Overlap Test.

2.    *Application of the Substantial Overlap Test*

Although Example 3 refers to an RFC, we determine this is not intended as evidence of Treasury's prohibition against application of the Substantial Overlap Test to a portfolio containing an equity swap arrangement, such as in this Transaction. Respondent acknowledges that if the Transaction is viewed as a unitary position (i.e., as a Portfolio Position), it complies with the Substantial Overlap Test. Petitioner argues that SIHP's Portfolio Position is substantially similar to Example 3 and provides substantial evidence, including a regulatory testing date from the Transaction. We agree with petitioner here.

On April 24, 2012, SIHP's Portfolio Position consisted of a permissible 64% overlap. Of the total $3,441.8 million value in the Transaction, $2,215.9 million or 64% overlapped with the stock holdings on the testing date. The at-risk portion, the remaining 36%, however, was not from any difference between the long and short holdings in the Swiss Equities, but rather from the inclusion of the Firm Hedge. By including the Firm Hedge, as depicted below, SIHP ensured that it was always exposed to market risk for more than the required percentage, regardless of the Swiss Equities' being fully hedged. Below is an illustration of SIHP's compliance with the Substantial Overlap Test:



In sum, and relying upon the plain text of the regulation, we hold that the Transaction, consisting of a swap arrangement containing the Firm Hedge and the Swiss Equities, does not qualify as SSRP under the Substantial Overlap Test. *See* Treas. Reg. § 1.246-5(c)(1)(iii).

D.    *The Anti-Abuse Rule*

Respondent argues, notwithstanding SIHP's compliance with the Substantial Overlap Test, that the Transaction violates the Anti-Abuse Rule of Treasury Regulation § 1.246-5(c)(1)(vi), which reads as follows:

> Notwithstanding paragraphs (c)(1)(i) through (v) of this section, a position that reflects the value of more than one stock is a position in substantially similar or related property to the appropriate portion of the taxpayer's stock holdings if—
>
>    (A) Changes in the value of the position or the stocks reflected in the position are reasonably expected to virtually track (directly or inversely) changes in the value of the taxpayer's stock holdings, or any portion of the taxpayer's stock holdings and other positions of the taxpayer; and
>
>    (B) The position is acquired or held as part of a plan a principal purpose of which is to obtain tax savings (including by deferring tax) the value of which is significantly in excess of the expected pre-tax economic profits from the plan.

There is no express activation or trigger for the Anti-Abuse Rule. The rule applies to any position that reflects the value of more than one stock and is intended to affect both Portfolio and Nonportfolio Positions. *Id.*

The Anti-Abuse Rule comprises three elements: (i) the taxpayer has eliminated his economic risk of his stock holdings by holding a position that "virtually track[s]" its stock holdings, (ii) that position is held "as part of a plan a principal purpose of which is to obtain tax savings," and (iii) the tax savings obtained by the taxpayer are "significantly in excess of the expected pre-tax economic profits" of holding the position.[24] *See id.* For purposes of the Anti-Abuse Rule,

---

[24] The rule is elemental, meaning all three tests must be satisfied in order for the holding period to be reduced. While there are only two prongs to the rule, the

"reasonable expectations" are defined as "expectations of a reasonable person, based on all the facts and circumstances at the later of the time the stock is acquired or the positions are entered into." *Id.* para. (b)(4).

> 1. *Treasury Regulation § 1.246-5(c)(1)(vi)(A): The Virtual Tracking Test*

Under the first requirement of the Anti-Abuse Rule a taxpayer's changes in the value of the position must be reasonably expected to "virtually track" changes in its stock holdings. Treas. Reg. § 1.246-5(c)(1)(vi)(A). The Virtual Tracking Test is designed to identify circumstances where the taxpayer has formally complied with the Substantial Overlap Test and yet substantially eliminated all risk by looking to whether changes in the value of the position or the stocks reflected are reasonably expected to track (directly or inversely) changes in the value.[25] *Id.*

The text of the Virtual Tracking Test is broad and states:

> Changes in the value of the position or the stocks reflected in the position are reasonably expected to virtually track (directly or inversely) changes in the value of the taxpayer's stock holdings, or any portion of the taxpayer's stock holdings and other positions of the taxpayer . . . .

*Id.*

Petitioner's argument centers upon a unique reading of the foregoing text. Petitioner asserts that the Virtual Tracking Test applies differently to Portfolio and Nonportfolio Positions. Petitioner argues that the Virtual Tracking Test was crafted to "allow[] for the distinct treatment that Treasury mandated for Portfolio and Nonportfolio Positions" and interprets the "or" as an indication of separate guidance for the two classifications. Specifically, petitioner argues that the phrase

---

second prong includes a quantifying aspect, that the tax savings be "significantly in excess," which makes for a tertiary qualifying element to the Anti-Abuse Rule. Mere tax savings are not enough to trigger the rule.

[25] "Although there is no guidance on what it means for a derivative to virtually track a stock position, the term 'virtually track' is thought to require a fairly high standard of correlation (likely 0.9 to 0.95)." Matthew A. Stevens & David Martin, *The Care and Feeding of Basket Swaps*, 174 Tax Notes Fed. 1507 (2022) (citing I.R.S. Tech. Adv. Mem. 9128050 (July 12, 1991)). "Otherwise, the antiabuse rule would seem to subsume all the technical rules." *Id.*

"or the stocks reflected in the position" is meant to refer only to Nonportfolio Positions while the phrase "changes in the value of the position" may be used to test only Portfolio Positions. Petitioner also contends that Dr. Brennan has demonstrated, without rebuttal, through quantitative mathematics that the Transaction and Swiss Equities did not meet the Virtual Tracking Test for the tax year at issue.

Respondent in turn points us to the value of the short Swiss Equities reflected in the Transaction, which would reasonably be expected to virtually track inverse changes in the value of long Swiss equities held in the prime brokerage account. Respondent also contends Dr. Brennan's interpretation of the Virtual Tracking Test does not apply, claiming it is contrary to the Code and the regulations and is unreliable and unreasonable. We agree with respondent's arguments.

At trial Dr. Brennan opined that virtual tracking—in terms of a formula—is best thought of as a fraction wherein the change in overall value of a taxpayer's entire holdings acts as the numerator, while the change in value of taxpayer's stock holdings acts as the denominator. According to Dr. Brennan, if the percentage of this formula equals 100% or −100%, then the changes between a taxpayer's position and holdings virtually track; if the percentage deviation exceeds more than 5% (105% or 95%) then there is no virtual tracking. Applying this formula for virtual tracking, Dr. Brennan concluded SIHP's ownership in the Swiss Equities did not virtually track with that of the other positions taken in the Transaction.[26]

While the Court appreciates Dr. Brennan's expertise and knowledge on the subject, we find his proposed test to be contrary to our reading of the regulation. We agree with Dr. Brennan that the Virtual Tracking Test acts as a check to determine whether there is any hidden (or virtual) overlap between the entirety of a position, or the entirety of stocks reflected in the position, and a taxpayer's stock holdings, or a portion of the taxpayer's stock holdings and other positions of the taxpayer. However, we disagree with Dr. Brennan's application of a deviation percentage. Example 1 of Treasury Regulation § 1.246-5(d) provides as follows:

---

[26] Using three dates, March 1, April 2, and May 1, 2012, Dr. Brennan performed his virtual tracking test and arrived at a range of percentages of no greater than 91%.

Corporation A and Corporation B are both automobile manufacturers. The fair market values of Corporation A and Corporation B common stock primarily reflect the value of the same industry. Because Corporation A and Corporation B common stock are affected not only by the general level of growth in the industry but also by individual corporate management decisions and corporate capital structures, changes in the fair market value of Corporation A common stock are not reasonably expected to approximate changes in the fair market value of the Corporation B common stock. Under paragraph (b)(1) of this section, Corporation A common stock is not substantially similar or related to Corporation B common stock.

Contrary to Dr. Brennan's claims, the regulation does not contain a standard of deviation. Instead, like many examples found in the Treasury regulations, it was written to be purposefully generic as a guideline.

Dr. Brennan arrived upon a 5% deviation range by selecting a specific set of stocks (Toyota Motor Corp and Honda Motor Co. Ltd.) from the tax year at issue. While Dr. Brennan's formula follows good logic and appears apt, we find his sweeping application of a standard 5% deviation to be beyond the plain and ordinary meaning of the phrase "virtual tracking."[27]

We likewise find petitioner's reading of the Virtual Tracking Test unreasonably narrow and contrary to both the text of the regulation and its meaning. The regulation uses with the phrase "[*n*]*otwithstanding* paragraphs (c)(1)(i) through (v) of this section," specifically instructing the taxpayer to disregard the special rules regarding Portfolio and Nonportfolio Positions. Treas. Reg. § 1.246-5(c)(1)(vi) (emphasis added). We similarly find it difficult to locate the additional instructions petitioner insists exist in the text of the regulation. Petitioner argues that a Portfolio Position may be tested only on the full position and not on the stocks reflected therein, yet the test itself does not make this distinction and the Treasury regulations fail to use the word "portfolio."

---

[27] A wider, or alternatively narrower, precent of deviation (3% or 6%) could easily be justified if we were to utilize different companies or different time periods. For example, Dr. Cragg calculated a 10% deviation range during his testimony at trial between the change in values of Citigroup and Morgan Stanley.

Similarly, paragraph (c)(1)(vi) of the regulation, unlike paragraph (c)(1)(i) through (v), does not distinguish nor create separate rules for taxpayers to apply the Virtual Tracking Test based upon the relevant position (i.e., Portfolio vs. Nonportfolio Position).

On the basis of the above we read the regulation to be broad in application and determine Treasury intended for it to serve as a catch-all for potential abuse. If petitioner's arguments were correct, the Anti-Abuse Rule would seem to never apply in circumstances where a taxpayer has passed the Substantial Overlap Test. The preamble to the final regulations makes it clear that this is not the case. If the Anti-Abuse Rule applies, a position that reflects the value of two or more stocks (including a portfolio) is treated as SSRP even if those stocks and the taxpayer's stock holdings do not substantially overlap. *See* T.D. 8590, 1995-1 C.B. at 16. Considering SIHP also held short positions in the Swiss Equities under the Transaction, we determine these two positions are reasonably expected to virtually track under the Anti-Abuse Rule. *See* Treas. Reg. § 1.246-5(c)(1)(vi)(A).

### 2. *Treasury Regulation § 1.246-5(c)(1)(vi)(B): Principal Purpose and Significantly in Excess*

Virtual Tracking alone, however, is insufficient to apply the Anti-Abuse Rule. The second element of the test contains multiple variables and provides:

> [A] position that reflects the value of more than one stock is a position in substantially similar or related property to the appropriate portion of the taxpayer's stock holdings if—
>
> . . . .
>> (B) The position is acquired or held as part of a plan a principal purpose of which is to obtain tax savings (including by deferring tax) the value of which is significantly in excess of the expected pre-tax economic profits from the plan.

Treas. Reg. § 1.246-5(c)(1)(vi)(B). Breaking down the text of this Treasury regulation, we are to determine first whether the "position is acquired or held as part of a plan a principal purpose of which is to obtain tax savings."

Petitioner's expert witness Dr. Cragg asserts that there were no "tax savings" generated by the Transaction, arguing that neither QDI nor FTC should be classified as such. Respondent's experts each

produced their reports on the basis of Cohen's Analyses and contend the "tax savings" are attributed to QDI treatment and the anticipated FTC, which greatly exceeded the pretax profit. Respondent points to a range of estimated tax savings from $10.7 million to $14.7 million based on Cohen's 2010 Analysis and $22.2 million to $54.7 million based on Cohen's 2012 Analysis. Despite continuing to argue that no tax savings were considered or generated by the transaction, petitioner acknowledges that Dr. Nelken determined $10.7 million as the approximate "tax savings" from the Transaction. On rebuttal Dr. Nelken contends Dr. Brennan's reference to $10.7 million in tax savings was specific to tax year 2010 only and he would expect 2012 to have tax savings of more than $25 million because of the larger volume of trades. We agree.[28] Accordingly, and after considering all arguments presented, we adopt Dr. Nelken's conclusions and determine the approximate "tax savings" from the Transaction to be more than $25 million.[29]

Next, under the regulation we are to determine whether the "tax savings" obtained by the taxpayer are "significantly in excess" of the "expected pre-tax economic profits." *Id.*

When applying the Anti-Abuse Rule, paragraph (c)(1)(vi), the regulation defines the term "reasonable expectations" to mean:

> For purposes of paragraphs (b)(1)(i), (b)(2), or *(c)(1)(vi)* of this section, reasonable expectations are the expectations of a reasonable person, based on all the facts and circumstances at the later of the time the stock is acquired or the positions are entered into. Reasonable expectations include all explicit or implicit representations made with respect to the marketing or sale of the position.

*Id.* para. (b)(4) (emphasis added). This definition supplies two options applicable to the facts before us; the expected pretax economic profit of the plan could be calculated on the basis of either (1) the time the

---

[28] Respondent proposes the tax savings are far greater, and total to some $54 million. However, we decline to consider a tax credit for foreign taxes paid as a reduction in tax or tax savings. Equally, we do not accept the QDI savings figure offered, since some 78% to 80% of the gross dividend amounts paid on the Swiss Equities to SIHP was due back to Morgan Stanley under the ISDA and Transaction. *See supra* note 11.

[29] Our determination of the "tax savings" is akin to Dr. Nelken's conclusion and is a culmination of QDI treatment as well as foreign tax credits received under the relevant tax period.

position was entered into, shortly after Cohen's Analyses, or (2) the time the stock was acquired, here represented by the reports written by Dr. Cragg and respondent's experts. Respondent argues the former while petitioner argues the latter.

This case turns on the comparison of the expected pretax economic profit to the tax savings. If the latter is "significantly in excess" of the former, then the Anti-Abuse Rule applies, and the relevant holding periods must be reduced. Adjusting either value significantly affects the outcome of the regulation and this case. Both values are contested by the parties as neither "significantly in excess" nor "pre-tax" is defined by the regulation. We begin our analysis by assessing each party's calculations of expected pretax economic profit.

In determining the expected "pre-tax profit" under the Transaction, the parties' experts disagree over three material issues: the impact of Swiss taxes, the impact of the Firm Hedge, and the impact of other costs and expenses (including slippage and commissions) under the Transaction.

Petitioner argues that "pre-tax" as used in the Anti-Abuse Rule follows its common use elsewhere and that the pre-tax profit calculation should be just that; namely, the "expected pre-tax profit" should be calculated before application of all taxes.

Respondent's experts argue otherwise, asserting that it is improper to exclude the mandatory foreign Swiss tax withholdings as doing so would result in an inflation of any expected pretax profit. Drs. Nelken and DeRosa also note that SIHP's own profit analyses, Cohen's Analyses, account for Swiss taxes. The economic reality of the Transaction lends merit to respondent's argument. Because of applicable Swiss withholding taxes, SIHP received only 65% of each dividend from the Swiss Equities. There was no way for SIHP to receive 100% of the dividends on the Swiss Equities because 35% of each foreign dividend was subject to withholding by SFTA, and under any reclaim filed with SRTA the Swiss withholdings would only be reduced to 15%. We agree in part with respondent's position that Swiss withholdings must be accounted for in determining the expected "pre-tax profit" under the Transaction.

Endeavoring to apply the regulation as written, we will not determine the actual economic profits because the regulation directs us to determine the "*expected* pre-tax economic profits." Treas. Reg. § 1.246-

5(c)(1)(vi)(B) (emphasis added). Although the regulation does not define the term "pre-tax," it clearly stresses the existence of a quantitative value before the application of tax in order to compare the two and determine the amount of savings (including deferred tax) produced. *Id.* On the basis of Cohen's Analyses and testimony for trial, SIHP reasonably expected to receive preferential tax treatment under the Swiss Treaty, culminating in a 15% foreign tax rate. Consequently, we will consider the "pre-tax" calculation to include the reasonably anticipated rate of 15% for Swiss taxes. This determined, we will next address the impact of the Firm Hedge and the other costs and expenses (including slippage and commissions) under the Transaction.

On brief respondent first contends, before corrections, that Mr. Cohen's pretax profit analysis reflects SIHP's expected tax savings from the Swiss Equities to be significantly in excess of the expected pretax profit as follows:

|  | April 5, 2010 | April 15, 2010 | January 11, 2012 |
|---|---|---|---|
| Expected Pretax Profit | $151,529 | $974,348 | $2,422,913 |
| Tax Savings from QDI and Foreign Tax Credits | 14,724,960 | 12,423,000 | 22,215,027 |

We find respondent's argument here using Cohen's Analyses compelling. Mr. Cohen reflected an "expected pre-tax profit" of $2.4 million for the tax year at issue and tax savings significantly in excess of this amount. Furthermore, the amounts above are conservative as Cohen's 2012 Analysis fails to accurately consider all costs of the Transaction, including slippage costs, dividends owed, or the value of market appreciation for any short positions held in the Firm Hedge. Finally, Cohen's 2012 Analysis continued to unreasonably assume an immediate reclaim from SFTA, despite not receiving one in either year 2010 or 2011.[30]

Petitioner's expert Dr. Cragg ultimately concluded there was an expected 2012 pre-tax economic profit of approximately $32 million. He arrived at this amount on the basis of net dividends of $40 million, Firm Hedge savings of $663,229, and expected costs of $8.7 million.

---

[30] The SFTA has no record of SIHP's filing a reclaim request for 2012 and similarly has not accepted the claim for either 2010 or 2011.

In rebuttal Drs. DeRosa and Nelken offer several opinions as to the expected pretax profit of the Transaction. Dr. Cragg contends both Drs. Nelken and DeRosa in turn erroneously determine the pretax economic profits under the Anti-Abuse Rule because their calculations include taxes and consider only the burdens of the Firm Hedge and none of the benefits. Dr. Cragg's final calculation reflects a pretax profit of $31 million, but only after adding an estimate of the economic benefits of the Firm Hedge, which Dr. Cragg qualifies as being some $121 million, and other adjustments. We find Dr. Cragg's benefit valuation of the Firm Hedge, estimated at $121 million, to be unreasonably subjective overall, and therefore we are unwilling to account for this benefit as he proposes. Further, Dr. Cragg's approach regarding the calculation of gross and substitute dividends appears inconsistent.

Respondent's expert Dr. DeRosa concluded that there was an expected pretax loss of more than $17.5 million.[31] However, upon examining Dr. DeRosa's report we noticed several inconsistencies. Dr. DeRosa begins his analysis by estimating fewer total shares for the Swiss Equities than those reported by SIHP and used by the other two opining experts. Having calculated a substantially different gross dividends amount, Dr. DeRosa proceeds to use a dividend ratio[32] different from that of Dr. Cragg or Dr. Nelken, applying a flat rate of 80.5%. Regrettably, these factors give us pause in relying upon Dr. DeRosa's report on this matter, and we instead turn to consider Dr. Nelken's report for respondent.

Respondent's expert Dr. Nelken calculated the actual profit on the Swiss Equities for years 2010 and 2012, finding losses of more than

---

[31] Dr. DeRosa noted at trial that, according to the data provided, the Firm Hedge should have prevented SIHP from ever making a profit and questioned whether SIHP had made a significant error in tracking the Firm Hedge. He opined that the premise of the "industry leading firm in the trading world" entering into a deal that resulted in such massive losses left the expert scratching his head.

[32] Each expert applied the same basic formula to calculate initial profit before cost. Gross Dividends (or Number of Stocks * Dividend Amount * USD Conversion Rate) – Dividend Ratio (which equals the amount owed to Morgan Stanley per dividend received). As noted, the dividend ratio affects the profit calculation directly and independently of any applicable withholding taxes. Thus it is one of the most important variables when determining whether tax savings were significantly in excess of expected pretax profits. No two experts used the same ratio %.

$42 million and nearly $120 million, respectively.[33] He observed that any margin of profit would be "razor thin," meaning that even a small difference between SIHP's expectation and reality would result in an overall loss.

Drs. Nelken and DeRosa agree that, on the basis of mandatory withholding taxes and the anticipated dividend ratios owed to Morgan Stanley, the Transaction could not be profitable. Still, it is difficult to accept respondent's contention that SIHP—a sophisticated financial investment firm—would have entered into the Transaction expecting a pretax loss anywhere near the conclusions reached by respondent's experts. The evidence, however, speaks for itself. All three experts agree that if Swiss taxes and the Firm Hedge are included in the pretax profit calculation, the transaction results in a substantial loss for the year at issue.

While we generally agree with Dr. Cragg's assessment that it defies logic to conclude that SIHP entered the Transaction expecting to lose between $70.8 million and $119.9 million, when the potential tax savings were (as respondent contends) at most $54 million, we also acknowledge that petitioner is unable to produce any expected profit and loss analyses other than Cohen's Analyses. If, as petitioner argues on brief, Cohen's spreadsheets were not intended to act as a comprehensive analysis, then petitioner's argument suggests that no comprehensive analysis was performed before SIHP entered into the Transaction. Subsequently, this implies that SIHP did not know to what extent the venture might be profitable beyond potential tax savings, which were available only because of the inclusion of the Firm Hedge, which held short and long positions in the Swiss Equities. The lack of a prior comprehensive analysis lends weight to respondent's arguments regarding the lack of anticipated profit when the Transaction was entered into, and we accordingly accept Cohen's expected pretax profit estimate of $0 to $2.4 million.

Because of the inconsistencies in Dr. Cragg's and Dr. DeRosa's reports, as well as the lack of any pretransactional analysis other than the data presented by Cohen's Analyses, we rely upon Dr. Nelken and Cohen's 2012 Analysis. Having reviewed all opinions offered, and on the

---

[33] Dr. Nelken details a number of issues he has with Cohen's calculations such as the probability of the Swiss tax reclaim, typos, dividend payment obligations on the short positions, obligations due under the Transaction, slippage, margin interest, and dividend ratios used, to name a few.

basis of the preponderance of evidence received, we conclude the most accurate and applicable determination of the expected pretax profit is a pretax loss of $31 million on the low end as concluded by Dr. Nelken, to a profit of $2.4 million on the high end, as reflected in Cohen's 2012 Analysis.

Having determined that the expected pretax profit ranges between $0 and $2.4 million, while the corresponding estimated tax savings are some $25 million, we determine that the value of the tax savings is significantly in excess of the expected pre-tax economic profits. *See* Treas. Reg. § 1.246-5(c)(1)(vi)(B). We therefore determine the Anti-Abuse Rule of Treasury Regulation § 1.246-5(c)(1) is applicable to the Transaction and that, on the basis of the evidence presented, the Transaction fails to comply with the Anti-Abuse Rule. We hold that SIHP's position in the Swiss Equities is SSRP.

V.      *Foreign Tax Credits*

Under the Swiss Treaty nonresidents of Switzerland can file a reclaim to obtain a return of 20% of the gross dividends received on Swiss equities. *See* Convention for the Avoidance of Double Taxation, *supra*, art. 10; Notice 2011-64, 2011-37 I.R.B. at 231. At the time dividends were paid on the Swiss Equities at issue, Swiss tax was withheld at 35%. SIHP anticipated, however, that it would be entitled to a refund of taxes, via submitting a reclaim request to SFTA, which would reduce the rate to 15% and thus give rise to the foreign tax credits at issue of $25,614,729.

To be eligible to claim FTC for withholding taxes imposed on dividends, a taxpayer must hold the dividend-paying equity for at least 15 days during the 31-day period beginning on the date which is 15 days before the ex-dividend date. I.R.C. § 901(k)(1). In no event shall a credit be permitted if the recipient of the dividend is under an obligation (whether pursuant to a short sale or otherwise) to make related payments on SSRP positions. I.R.C. § 901(a), (k)(1).

Respondent does not dispute that SIHP held the Swiss Equities for 62 days. Instead, respondent relies on petitioner's argument that SIHP diminished its risk of loss by holding one or more positions in SSRP under section 246(c)(4)(C) and Treasury Regulation § 1.246-5.

Because we find that the Swiss Equities are SSRP for purposes of section 246 and the related regulations, SIHP is barred from claiming

FTC under section 901(a) and (k)(1). We hold that SIHP has not satisfied the statutory requirements to claim the FTC.

VI.    *Conclusion*

Since we have determined that the Swiss Equities are SSRP for purposes of section 246 and the related regulations, the holding period for these equities is accordingly reduced, and SIHP is ineligible to receive QDI on dividends received or claim FTC. Accordingly, we will sustain respondent's proposed adjustments.

In reaching our decision we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant, moot or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*